UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS -- EASTERN DIVISION

-------------------------------------------------------------------------x

| | |
|---|---|
| THE AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS, INC., GRAPHIC ARTISTS GUILD, PICTURE ARCHIVE COUNCIL OF AMERICA, INC., NORTH AMERICAN NATURE PHOTOGRAPHY ASSOCIATION, PROFESSIONAL PHOTOGRAPHERS OF AMERICA, LEIF SKOOGFORS, AL SATTERWHITE, MORTON BEEBE, ED KASHI, JOHN SCHMELZER, SIMMS TABACK, LELAND BOBBE, JOHN FRANCIS FICARA, and DAVID W. MOSER, on behalf of themselves and all others similarly situated, | Case No. 13-cv-00408<br>Judge Harry D. Leinenweber<br><br>Principal case pending in the United States District Court for the Southern District of New York, Case No. 10-CV-02977 (DC) |
| Plaintiffs, | |
| -against- | |
| GOOGLE, INC., | |
| Defendant. | |

-------------------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO RECONSIDER
AWARD OF FEES AND COSTS PURSUANT TO F.R.C.P. 45(C)(1)**

Hanson L. Williams
WILLIAMS MONTGOMERY & JOHN LTD.
233 S. Wacker Drive, Suite 6100
Chicago, IL 60606
(312) 433-3200 (phone)
(312) 630-8500 (fax)

Mark A. Berube (*pro hac vice*)
MISHCON DE REYA NEW YORK LLP
750 Seventh Avenue, 26th Floor
New York, NY 10019
(212) 612-3270 (phone)
(212) 612-3297 (fax)

*Attorneys for Plaintiffs and the Prospective Class*

The American Society of Media Photographers, Inc., Graphic Artists Guild, Inc., Picture Archive Council of America, Inc., North American Nature Photography Association, Professional Photographers of America, Leif Skoogfors, Al Satterwhite, Morton Beebe, Ed Kashi, John Schmelzer, Simms Taback, Leland Bobbe, John Francis Ficara, and David W. Moser (collectively, "Plaintiffs"), by their attorneys, respectfully submit this Memorandum of Law, along with the Declaration of Mark A. Berube, Esq., dated June 3, 2013 ("Berube Decl."), and Declaration of Elizabeth M. Rotenberg-Schwartz, Esq., dated June 3, 2013 ("Rotenberg-Schwartz Decl."), in support of Plaintiffs' Motion to Reconsider the Court's May 6, 2013 Memorandum Opinion and Order (Docket No. 27) ("Order"), pursuant to Federal Rules of Civil Procedure 52(b) and 59(e), as well as the Court's inherent power, to the extent that it directs Plaintiffs to pay Tribune Media Services, LLC's ("TMS") reasonable attorneys' fees and costs pursuant to F.R.C.P. 45(c)(1). For the reasons explained herein and in the remainder of the record, the Court should vacate its Order that Plaintiffs pay TMS its reasonable attorneys' fees and costs.

## PRELIMINARY STATEMENT

Plaintiffs subpoenaed information from TMS regarding TMS's licensing of copyrighted images. Plaintiffs sought this information in order to address the fourth factor of the fair use analysis -- an inquiry central to the principal defense asserted by Google, Inc. ("Google") in Plaintiffs' putative copyright class action lawsuit pending in the United States District Court for the Southern District of New York. Specifically, Plaintiffs understood that TMS licensed images from numerous rightsholders and in turn licensed them to its customers. Plaintiffs explained to TMS that the information sought was relevant to addressing factor four of the fair use analysis concerning the potential market for or value of Plaintiffs' visual works, which can be proven by analogy to a market in a similar context.

During the meet-and-confer process, both prior to and after TMS filed its Motion to Quash, Plaintiffs offered to narrow the scope of the Subpoena to call for the initial production of only a handful of documents. TMS's consistent position was that it would produce no information. Further, again during the meet-and-confer process, Plaintiffs offered to withdraw the Subpoena entirely, if TMS would simply confirm whether or not Plaintiffs' understanding of TMS's role as a licensing intermediary was correct. At best, TMS only arguably provided this confirmation in its Reply.

As explained below, Plaintiffs' conduct here did not warrant an award of reasonable attorneys' fees and costs under Federal Rule of Civil Procedure 45(c)(1) because (i) Plaintiffs did not know until -- at best -- TMS filed its Reply that TMS may not be a licensing intermediary, and (ii) Plaintiffs repeatedly narrowed the scope of the Subpoena to alleviate any burden on TMS. Under the reasoning of the cases both here and in other jurisdictions that have considered this issue, the Court's award of attorneys' fees and costs was manifest error.

## FACTUAL BACKGROUND

Plaintiffs respectfully refer the Court to the factual background set forth in Plaintiffs' Memorandum of Law in Opposition to TMS's Motion to Quash, filed February 1, 2013 (Docket No. 19) ("Opposition"), at 2-4, for an explanation of Plaintiffs' underlying lawsuit in New York. For the reasons explained therein, on or about December 10, 2012, Plaintiffs served a subpoena *duces tecum* on TMS, seeking information related to its licensing of copyrighted images. See Memorandum in Support of Motion to Quash Subpoena, filed January 17, 2013, at Exhibit 1 (Docket No. 5-1) ("Subpoena"). Shortly thereafter, on or about December 20, 2012, David Bradford, Esq., a Partner at Jenner & Block LLP, contacted Plaintiffs' counsel to request an extension of time to respond to the Subpoena due to existing travel plans. See Berube Decl. at ¶ 2, Ex. A. Plaintiffs' counsel replied to Mr. Bradford that same day, consenting to an extension of time

and providing a copy of the So Ordered Protective Order governing Plaintiffs in their action against Google in New York. See Rotenberg-Schwartz Decl. at ¶ 2, Ex. A. Then, on or about December 26, 2012, Plaintiffs' counsel conferred with Andrew Vail, Esq., also a Partner at Jenner & Block LLP. Plaintiffs' counsel explained that the information Plaintiffs sought from TMS was relevant to addressing the fourth factor of the fair use analysis in the underlying action. Plaintiffs' counsel further explained that the scope of discovery Plaintiffs sought from TMS was limited to its TV Showcard product. See Id. at ¶ 3.

Following the winter holidays, counsel continued the meet-and-confer process, communicating both telephonically and by e-mail. Plaintiffs' counsel communicated with Mr. Bradford and Mr. Vail. See Declaration of Mark A. Berube, Esq. in Opposition to Tribune Media Services, LLC's Motion to Quash Subpoena, dated February 1, 2013 (Docket No. 19-1) ("Feb. 1 Berube Decl.") at ¶ 6; Rotenberg-Schwartz Decl. at ¶ 4; Declaration of Andrew W. Vail, dated January 17, 2013 (Docket No. 5-5) ("Vail Decl."), at Ex. A. During the meet-and-confer process, and prior to the filing of TMS's Motion to Quash, Plaintiffs' counsel explained the relevance of TMS's documents while also offering to narrow the scope of the Subpoena in order to reduce the burden on TMS. See Feb. 1 Berube Decl. at ¶ 6; Rotenberg-Schwartz Decl. at ¶ 5; Vail Decl. at Ex. A. Specifically, Plaintiffs' counsel explained that they understood that TMS licensed images from numerous rightsholders and in turn licensed them to its customers and that the information sought by Plaintiffs was relevant to addressing factor four of the fair use analysis concerning the potential market for or value of Plaintiffs' visual works, which can be proven by analogy to a market in a similar context. See Rotenberg-Schwartz Decl. at ¶ 5.

On or about January 14, 2013, after reviewing case law Mr. Vail provided on the standards applicable to motions to quash in the 7th Circuit, Plaintiffs' counsel responded by e-mail that the case law was distinguishable on the ground that Plaintiffs here, unlike the issuing-parties in the case

law, could demonstrate how TMS's information was relevant. See Rotenberg-Schwartz Decl. at ¶ 6; Vail Decl. at Ex. A. In that same e-mail, Plaintiffs' counsel explained the relevance of TMS's information to the fair use question and provided authority for TMS's counsel to review. See Rotenberg-Schwartz Decl. at ¶ 6; Vail Decl. at Ex. A. TMS's counsel never responded to that e-mail or the authority cited therein prior to filing the Motion to Quash. See Berube Decl. at ¶ 3; Rotenberg-Schwartz Decl. at ¶ 6.

During the meet-and-confer process, and prior to the filing of TMS's Motion to Quash, Plaintiffs' counsel also offered to narrow the scope of the Subpoena to only a limited document production. See Feb. 1 Berube Decl. at ¶ 6.[1] During a telephone conference on or about January 11, 2013, Plaintiffs' counsel asked if TMS had a business plan or other similar documents it could produce that explained its product and licensing offering, and explained that Plaintiffs sought to provide such information to their expert to rely upon in crafting a report. Plaintiffs' counsel advised TMS's counsel that production of such limited information could obviate the need for a deposition and for any further document production. See Rotenberg-Schwartz Decl. at ¶ 5. In response, Mr. Bradford stated that based upon the case law he had seen he did not believe TMS was under an obligation to produce any information and he did not see any risk to TMS in denying Plaintiffs' counsels' request. See id.

The fact that Plaintiffs' counsel did offer to narrow the scope of the Subpoena prior to the Motion to Quash being filed is evidenced by a voicemail Mr. Bradford left Plaintiffs' counsel on or about January 17, 2013 at 4:38 p.m. EST, in which Mr. Bradford stated "The suggestions you had

---

[1] "Plaintiffs offered to narrow the scope of the Subpoena, requiring TMS to only initially produce a handful of documents that would illustrate how TMS licenses images for their television showcards. Plaintiffs stated that they would likely be able to forego any additional discovery, including any testimony, if TMS would agree to this limited document production. Additionally, Plaintiffs explained that any information produced would be protected by the comprehensive Protective Order already in place in the main action against Google pending in the United States District Court for the Southern District of New York, and provided TMS with a copy of the Protective Order."

Legal1US.110768.1     4

made in our last conversation about dropping the witness portion of the subpoena but proceeding on the document portion as indicated to you is not acceptable to our client." The full transcript of the voicemail was handed up to the Court during the oral argument on the Motion to Quash. See Berube Decl. at ¶ 4, Ex. B. TMS's counsel left this voicemail on the same day that it filed the Motion to Quash. At no point prior to filing the Motion to Quash did TMS's counsel advise Plaintiffs' counsel that TMS would be seeking its costs and fees, or that it viewed Plaintiffs' Subpoena as in any way sanctionable. See Berube Decl. at ¶ 4; Rotenberg-Schwartz Decl. at ¶ 8.

Despite Plaintiffs' efforts to resolve TMS's objections to the Subpoena by explaining the relevance of the information sought (including through the provision of authority that TMS never responded to), narrowing the scope of information requested, and providing TMS with the Protective Order under which its documents would be produced, on or about January 17, 2013, TMS filed its Motion to Quash. See Berube Decl. at ¶ 5; Rotenberg-Schwartz Decl. at ¶ 7. TMS's Motion to Quash echoed the position it had taken throughout the meet-and-confer process -- TMS would produce no information whatsoever. In its moving papers, TMS focused on its lack of connection to Plaintiffs, Google, and photographs scanned by Google in its Library Project. See Memorandum in Support of Motion to Quash, filed January 17, 2013 (Docket No. 5), at 1-2, 7. The statements made in TMS's moving papers reflected misunderstandings as to the relevance of TMS's licensing activities to Plaintiff's case against Google and the specific information Plaintiffs sought to obtain.

In an attempt to clear up the confusion, Plaintiffs' counsel called Messrs. Bradford and Vail on or about January 24, 2013 to again explain why Plaintiffs believed TMS's documents were relevant. See Feb. 1 Berube Decl. at ¶ 7; Berube Decl. at ¶ 6. During that call, Plaintiffs counsel offered to withdraw the subpoena, if TMS would confirm that it did not in fact license images from rightsholders and in turn license them to third-parties through its TV Showcards, acting as a

licensing intermediary. See Feb. 1 Berube Decl. at ¶ 7; Berube Decl. at ¶ 6. On or about January 28, 2013, Plaintiffs' counsel followed up on this call with an e-mail to Mr. Vail asking if he had "been able to get any additional information" from TMS on this point. See Berube Decl. at ¶ 6, Ex. C. Later that day, Mr. Vail e-mailed a letter to Plaintiffs' counsel "to respond to the questions [Plaintiffs' counsel] asked during that telephone conference." Mr. Vail wrote in pertinent part:

> To respond to your questions about TMS's activities, which you should have answered yourself before issuing this subpoena, I can unequivocally state again that TMS does not acquire, sell or license images in a manner that is remotely comparable to the Google Library Project. The only similarity that you have identified between our client's television program information and Google's Library Project is to characterize certain elements of the mix of information **licensed by TMS** as including "low resolution images" and to assert that the images on the Google website are "low-resolution" images. Although we disagree strenuously with that characterization of our client's product, the relative quality of images, which were acquired from different sources for different editorial purposes, **and licensed to** completely different customers in different markets in completely different ways, provides no basis for suggesting that our client's business activities are relevant to whether there is a market for the copyrighted images at issue in your litigation.

See Feb. 1 Berube Decl. at Ex. B (emphasis supplied). In response to this letter -- which instead of directly answering Plaintiffs' basic question actually indicated that TMS **does** license images through its TV Showcards -- Plaintiffs' counsel again called TMS's counsel, this time offering to arrange a conference call with Plaintiffs' copyright expert so that he could explain how TMS's documents were relevant. See Feb. 1 Berube Decl. at ¶ 7. On or about January 28, 2013, Mr. Vail rejected this offer. See Feb. 1 Berube Decl. at Ex. C. Plaintiffs' counsel responded to this rejection by letter the following day, writing in pertinent part:

> As we have repeatedly communicated to you, **it is our understanding that TMS obtains licensed images and in turn licenses them to third-parties in the form of TV show cards. TMS appears to act as an intermediary and license the images to third-parties for their promotional use. . . . What we have asked you to do is simply provide us with basic and limited information about TMS's business practices to confirm whether our understanding is correct. We made clear that if our understanding is incorrect, we would be amenable to withdrawing the subpoena.** You have refused to provide this limited information, and have instead unilaterally declined to continue negotiations.

Legal1US.110768.1                                6

> You also attack the breadth of the subpoena and reference the costs that TMS has incurred. **However, you conveniently fail to mention our offer to limit the requested discovery to a very limited initial production of documents by TMS.** Further, any documents produced would be protected from dissemination by the Protective Order in place.

See id. at Ex. D (emphasis supplied). Plaintiffs' counsel also again explained how TMS's documents were relevant, and again stated that Plaintiffs' were willing to meet and confer to resolve TMS's objections. Two days later, Mr. Vail wrote Plaintiffs' counsel. In that letter, Mr. Vail did not address Plaintiffs' question as to TMS's role as a licensing intermediary, ignored Plaintiffs' offer to withdraw the Subpoena entirely if just that limited information was provided, ignored, as reflected in Plaintiffs' January 29, 2013 letter, Plaintiffs' repeated offer to limit any production to "a very limited initial production of documents by TMS," and instead recounted only that Plaintiffs had offered to forego a deposition. See Feb. 1 Berube Decl. at Ex. D. Throughout the entire meet-and-confer process, TMS refused to discuss even the possibility of a limited production of documents in response to the Subpoena, whatever the scope of said production. See Berube Decl. at ¶ 7.

On or about February 12, 2013, TMS filed its Reply Memorandum. See Reply Memorandum in Support of Motion to Quash Subpoena, filed February 12, 2013 (Docket No. 24) ("Reply"). Although this filing contained the closest thing to an answer to Plaintiffs' question to that date, it still did not directly answer it. In its Reply, TMS stated that "TMS is not a licensor of stand-alone images, either in connection with its TV Showcards or otherwise. TMS is not a licensing intermediary, like ASCAP or BMI, for stand-alone images or image collections." See id. at 3. However, TMS still never addressed the issue, as Plaintiffs had repeatedly asked it to do, of whether it licensed images from multiple rightsholders and in turn licensed them to its customers as

an intermediary through its TV Showcards. Moreover, TMS only made these assertions through argument of counsel in its Reply. The record is entirely devoid of evidence on this point.[2]

The Court heard oral argument on the Motion to Quash on February 19, 2013. Plaintiffs' drastic narrowing of the Subpoena in an attempt to alleviate all burden on TMS was again demonstrated at the oral argument, where Plaintiffs' counsel explained,

> I have narrowed the subpoena through meet-and-confer meetings with TMS's counsel to only seek at this point, Your Honor, a handful of documents, a handful of documents. I'm not even seeking a deposition at this time. All I'm asking them to do is produce a handful of documents that would evidence that they engage or they act as an intermediary in the way I'm saying. That's all I'm asking for.
>
> I think, for example, Your Honor, documents that could satisfy my request would simply be redacted copies of contracts between TMS and its customer, third-party customer, demonstrating that it acts as this licensing intermediary and it licenses images of this sort. I want no more than that.
>
> I just want my expert to be able to rely on those documents to opine that entities like TMS exist, arise to collectively licensed copyrights, and do so in the television industry, to support my argument on factor 4 of the fair use doctrine.

See Berube Decl. at Ex. D ("Tr.") at 9:5-21); see also id. at 17:4-7 ("Where we are right now, Your Honor, I've requested a handful of documents, for instance, redacted licensing agreements, just to establish they do this. That's all I'm asking for. The burden is nil on TMS at this time."). When questioned by the Court as to the quantity of documents Plaintiffs were seeking, Plaintiffs' counsel replied "two or three." See id. at 17:11-13. Notably, at the oral argument, Mr. Bradford acknowledged that Plaintiffs had narrowed the scope of the Subpoena. See id. at 10:7-8. Additionally, to address TMS's confidentiality concerns, Plaintiffs' counsel offered to not even use the documents at trial; rather, the documents would only be shown to Plaintiffs' expert so he could conduct his analysis. See id. at 20:4-7 ("I would be willing to enter into an agreement with them that

---

[2] Notably, in another area of its Reply, TMS indicated that it ***does*** license photographs as part of the information it licenses to its customers. See id. at 11 (acknowledging the existence of "confidential ***licensing agreements***, which contain competitively sensitive information about pricing and the ***licensing arrangements*** it has with its customers") (emphasis supplied).

I would not disclose these documents at trial. I just want an expert to rely on them to do a report. That's all I'm asking for.").

Regarding the issue of whether TMS acts as a licensing intermediary, Mr. Bradford made additional representations on this point at the argument, and specifically noted that Plaintiffs had offered to withdraw the Subpoena, if TMS would simply confirm whether Plaintiffs understanding was correct:

> He said in his January 29 letter that he would withdraw his subpoena if he was wrong in his understanding, and I'll state for the record he is wrong in his understanding. He said specifically, quote:
>
> "It is our understanding that TMS obtains licensed images and in turn licenses them to third parties in the form of TV show cards. TMS appears to act as an intermediary and license the images to third parties for their promotional use." He went on to say: "We made clear if our understanding is incorrect, we would be amenable to withdrawing our subpoena."
>
> He just repeated it again and said we were licensing intermediaries. I'll represent to the Court and we'll give further affidavits, if necessary, that we are not licensing intermediaries.

See id. at 11:16-12:7. As evidenced above, Mr. Bradford admitted at the oral argument that further evidence on this point may be necessary. See id.

## ARGUMENT

### I

### LEGAL STANDARD

"A motion for reconsideration serves the limited function to correct manifest errors of law or fact," Shaw v. Klinkhamer, No. 03 C 6748, 2005 WL 1651179, *2 (N.D. Ill. July 1, 2005), and may be brought under Federal Rules of Civil Procedure 52(b) and 59(e), as well as pursuant to the Court's inherent power to reconsider its own decisions. See Sunrise Opportunities, Inc. v. Regier, No. 05 C 2825, 2006 WL 581150, *4 (N.D. Ill. Mar. 7, 2006) (concluding Court made mistake in prior decision and granting motion for reconsideration). Under each of these options, "the standard applied is generally the same," id. at *4 n.5, namely that a motion for reconsideration should be

Legal1US.110768.1                      9

granted "where the court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension."  U.S. v. Olsen, No. 98 C 2170, 2001 WL 817854, *2 (N.D. Ill. July 19, 2001) (Leinenweber, J.) (internal quotations omitted) (finding reconsideration appropriate); see also Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Indiana, No. 12 C 6066, 2013 WL 951147, *1 (N.D. Ill. Mar. 12, 2013) (Leinenweber, J.) (same).

## II

## THE COURT ERRED IN AWARDING COSTS AND FEES TO TMS.

### A. The Threshold For An Award Of Costs And Fees Under Rule 45(c)(1) Is Very High.

Although Federal Rule of Civil Procedure 45(c)(1) provides that "[t]he issuing court must enforce this duty [to avoid imposing undue burden or expense on a person subject to a subpoena] and impose an appropriate sanction -- which may include lost earnings and reasonable attorney's fees -- on a party or attorney who fails to comply," Fed. R. Civ. P. 45(c)(1), "the few courts to have considered the question have properly held that the nominally mandatory language [of Rule 45(c)(1)] vests discretion in the court to determine that 'reasonable steps' were taken to alleviate undue burden, precluding the necessity for sanctions."  9 James Wm. Moore et al., Moore's Federal Practice ¶ 45.33 (3d ed. 2012).  Indeed, this Court has found fee awards unwarranted even in situations where the issuing party engaged in patently abusive behavior.  See, e.g., Nat'l Claims Mgmt. Corp. v. Mercedes-Benz of N. Am., Inc., No. 97 C 6293, 1998 WL 27136, *2 (N.D. Ill. Jan. 15, 1998) (denying request for fees and expenses where third-party subpoena "unnecessary, unreasonable, and oppressive"); In re Elec. Weld Steel Tubing Antitrust Litig., 512 F.Supp. 81, 84 (N.D. Ill. 1981) (award of fees "unjust" even where unreasonably burdensome and oppressive subpoena reissued in District in order to circumvent prior order of another District Court); see also Reytblatt v. Ill. Inst. of Tech. (IIT), No. 97 CV 927, 1999 WL 181995, *3 (N.D. Ill. Mar. 24, 1999)

(awarding only $500 in fees for Rule 45 violation where plaintiff's vexatious litigation practices led Court to dismiss case entirely as sanction).[3]

The sole authority upon which the Court relied to find an award of reasonable costs and fees appropriate here, and for the proposition that good faith issuance of a subpoena is insufficient to avoid sanctions, Builders Ass'n of Greater Chi. v. City of Chi., No. 96 C 1122, 2002 WL 1008455 (N.D. Ill. May 13, 2002), is a paradigm example of abusive behavior. In Builders Ass'n, the Court was faced with a party that had issued **500** third-party subpoenas with 49-category boilerplate riders. 2002 WL 1008455, at *4. As the Court noted, "there is no indication that the [issuing party] attempted to tailor its subpoenas *in any way* to the nature of the recipients, the types of documents they would be likely to produce, or their resources to respond." Id. Then, after the third-parties objected to the subpoenas, rather than attempting to narrow the subpoenas' scope, the issuing party

---

[3] Further, where a party has acted in good faith and taken steps to mitigate the burden imposed on the subpoenaed party, Courts have found sanctions inappropriate. See Terry v. Zernicke, No. 94 C 4052, 1996 WL 5183, *3 (N.D. Ill. Jan. 2, 1996) (fees not warranted where, although party's position on "some of the discovery issues was not substantially justified," positions "were not completely frivolous"); Mount Hope Church v. Bash Back!, 705 F.3d 418, 429 (9th Cir. 2012) (holding that "absent undue burden imposed by an oppressive subpoena, a facially defective subpoena, or bad faith on the part of the requesting party, Rule 45(c)(1) sanctions are inappropriate"); Tiberi v. CIGNA Ins. Co., 40 F.3d 110, 112 (5th Cir. 1994) (award of fees abuse of discretion where parties engaged in "sufficient good faith efforts to negotiate reasonable parameters on the subpoena"); Dean Foods Co. v. Prairie Farms Dairy, Inc., No. 10-mc-67, 2011 WL 841046, *10 (C.D. Ill. Mar. 7, 2011) (fee award inappropriate where party had good faith basis to issue third-party subpoena); Alberts v. HCA Inc., 405 B.R. 498, 504 (D.D.C. 2009) (sanctions inappropriate where absence of bad faith, conduct reasonable, and minimal burden imposed); In re eBay Seller Antitrust Litig., No. C09-735RAJ, 2009 WL 5205961, *4 (W.D. Wash. Dec. 23, 2009) (sanctions inappropriate where party "made a good faith effort to limit its subpoena, and . . . its arguments in favor of compliance with the subpoena were not unreasonable"); Orgulf Transp. Co. v. Grillot Co., No. Civ.A. 97-228, 1998 WL 313732, *2 (E.D. La. June 12, 1998) ("when the burden placed upon a subpoenaed witness is attributable to inadvertence as opposed to bad faith, and the party issuing the subpoena makes attempts to comply with Rule 45(c)(1)'s restraints, sanctions are inappropriate"); Dravo Corp. v. Liberty Mut. Ins. Co., 160 F.R.D. 123, 128-29 (D. Neb. 1995) (analyzing Rule 45(c)(1) request for fees under Federal Rule of Civil Procedure 11 framework, holding sanctions inappropriate where party's "discovery efforts were objectively reasonable because its legal contention that it had a right to the documents was warranted . . . by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law . . .") (internal quotations omitted).

filed motions to compel compliance with the subpoenas. Id. at *5. It is this combination of behavior that led the Court to award reasonable attorneys' fees and costs.[4]

Moreover, **the Magistrate Judge's decision in Builders Ass'n to award fees and costs was subsequently reversed by the District Court**. In sustaining objections to the Magistrate Judge's grant of fees, Senior District Judge Moran analogized Federal Rule of Civil Procedure 45(c)(1) to Federal Rule of Civil Procedure 26. Builders Ass'n of Greater Chi. v. City of Chi., 215 F.R.D. 550, 553-54 (N.D. Ill. 2003). Senior Judge Moran explained that sanctions were inappropriate because certain factual determinations regarding whether the issuing party had acted in good faith had not been made. Specifically, Senior Judge Moran posited that the party issuing the subpoenas believed the subpoenaed information to be very important, and that it may have had "a basis for a good faith argument for the extension, modification or reversal of existing law," directly overruling the Magistrate Judge's holding that sanctions are appropriate even if the issuing party has a good faith basis to issue the subpoena. Id. at 554.[5] Additionally, Senior Judge Moran explained that rather than sanctions, the issuing party could have been required to simply reimburse the producing parties for their expenses in producing information responsive to the subpoenas. Id.

### B. It Was Error To Conclude That Plaintiffs Failed To Take Reasonable Steps To Prevent Undue Burden Or Expense On TMS.

The Court made the following finding in ordering Plaintiffs to pay TMS's reasonable fees and costs:

> The Court finds that Plaintiffs' counsel failed to take reasonable steps after meeting and conferring with TMS. *See id.* at *10. **After** learning TMS was not a licensing intermediary and was not in the business of licensing stand-alone images, Plaintiffs could have withdrawn the subpoena and attempted to subpoena a different organization that possessed the relevant

---

[4] The Court in Builders Ass'n also specifically noted that it was not deciding "whether a party that serves an unduly burdensome subpoena, thus requiring the responding non-party to retain counsel to negotiate a modification, can avoid sanctions under Rule 45(c)(1) by subsequently agreeing to a reasonable scope." Id.

[5] See Builders Ass'n of Greater Chi. v. City of Chi., No. 96 C 1122, 2004 WL 442607, *1 (N.D. Ill. Mar. 9, 2004) (requiring finding of bad faith prior to awarding fees and costs under Rule 45(c)(1)).

Legal1US.110768.1            12

>information. This was not, however, the course of action Plaintiffs chose. Instead, Plaintiffs demanded TMS to comply with the subpoena, and caused TMS to file the instant motion in this Court.

See Order at 13 (emphasis supplied). The Court's factual basis for awarding fees misapprehends the record evidence for two reasons. First, at best, it was not until its Reply that TMS arguably stated that it was not a licensing intermediary. Second, the record reflects Plaintiffs' numerous attempts to mitigate the burden on TMS by narrowing the scope of the Subpoena, ultimately to only two to three licensing agreements.

### 1. The Record Demonstrates That TMS, At Best, Only Informed Plaintiffs That It Was Not A Licensing Intermediary In Its Reply Brief.

It was error for the Court to conclude that Plaintiffs knew TMS was not a licensing intermediary prior to the Motion to Quash being filed. Rather, the first time TMS arguably stated that it was not a licensing intermediary was in its Reply, and then without any citation to evidence. See supra at 7-8. Indeed, the Court itself cited to TMS's Reply for the proposition that TMS is not a licensing intermediary. See Order at 7. Plaintiffs submit that the first time TMS's counsel attempted to directly address the issue of whether TMS was a licensing intermediary was at oral argument, where counsel acknowledged that a further affidavit on this point might be necessary. See supra at 9.[6] And, all this (including the filing of TMS's Reply on February 12, 2013) occurred **after** Plaintiffs' counsel had represented during a call with TMS's counsel on January 24, 2013 (as explicitly memorialized in Plaintiffs' counsels' January 29, 2013 letter) that Plaintiffs ***would withdraw the Subpoena entirely, if TMS would simply confirm whether or not Plaintiffs' understanding of TMS's role as a licensing intermediary was correct.*** See supra at 5-7. It is therefore manifest error to have found that Plaintiffs knew prior to TMS's Reply, and certainly prior

---

[6] It is Plaintiffs' contention that TMS has never adequately and fully addressed the issue of whether it is a licensing intermediary in the sense meant by Plaintiffs -- whether it licenses photographs from diverse rightsholders and in turn licenses them to third-parties through its TV Showcards. However, Plaintiffs argument here is one of notice -- Plaintiffs were not informed of TMS's position on this point until, at best, TMS's Reply Brief.

Legal1US.110768.1                                         13

to the Motion to Quash being filed, that TMS was not a licensing intermediary, and that Plaintiffs were under an obligation to have withdrawn the Subpoena prior to the filing of the Motion to Quash as a result.

        **2.**       **The Record Demonstrates That Plaintiffs Took Reasonable Steps To Ensure That The Subpoena Would Not Impose Undue Burden Or Expense On TMS.**

Second, it was error to conclude that Plaintiffs did not attempt to narrow the scope of the Subpoena in order to alleviate any burden on TMS. From the very start of the meet-and-confer process, Plaintiffs offered to limit the scope of the Subpoena. For example, prior to TMS filing its Motion to Quash, Plaintiffs' counsel had already offered to limit the Subpoena to call for a handful of documents (or perhaps even a single business plan) evidencing TMS's licensing activities with respect to its TV Showcards. See supra at 4. The fact that Plaintiffs' counsel made this offer is memorialized in a voicemail from TMS's counsel left for Plaintiffs' counsel the same day the Motion to Quash was filed. See supra at 4-5. Plaintiffs' counsels' further efforts to alleviate any burden on TMS is reflected in counsels' January 29, 2013 letter to TMS, where Plaintiffs' counsel restated "our offer to limit the requested discovery to a very limited initial production of documents by TMS." See supra at 6-7. Ultimately, Plaintiffs drastically narrowed the scope of their request to ask for only two or three examples of redacted licensing agreements which Plaintiffs could show to their expert for his analysis; these agreements would be protected by the robust Confidentiality Order in place in Plaintiffs' lawsuit in New York, and, Plaintiffs' counsel promised, would not be offered at trial. See supra at 8-9. On this record, it was manifest error to conclude that Plaintiffs failed to take reasonable steps to ensure that the Subpoena would not impose undue burden or expense on TMS.

    **C.**      **Should The Court Uphold Its Award Of Fees, Plaintiffs Anticipate Challenging The Reasonableness Of TMS's Fees.**

Although Plaintiffs will not address the amount of TMS's fees in detail here, they do note that the records provided by counsel to date show ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Legal1US.110768.1                               14

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

███ Plaintiffs submit that these hours and resulting fees are patently unreasonable on their face. TMS has not yet produced unredacted time entries supporting its fees, because the parties have not agreed whether Local Rule 54.3 applies in this setting and whether a protective order is necessary. The parties are still conferring in good faith on these issues. Further, TMS has not yet made any motion or application for its fees. Should the Court uphold its award of fees, Plaintiffs anticipate challenging the reasonableness of TMS's fees as reflected in unredacted time entries.

## CONCLUSION

For the reasons set forth above and in the remainder of the record, Plaintiffs respectfully request that the Court vacate its Order that Plaintiffs pay TMS its reasonable attorneys' fees and costs, and grant Plaintiffs such further relief as it deems just and proper.

| | |
|---|---|
| Dated: Chicago, Illinois<br>June 3, 2013 | Respectfully submitted,<br><br>WILLIAMS MONTGOMERY & JOHN LTD.<br><br>By: __/s/ Hanson L. Williams__<br>Hanson L. Williams |
| MISHCON DE REYA NEW YORK LLP<br>Mark A. Berube *(pro hac vice)*<br>750 Seventh Avenue, 26th Floor<br>New York, New York 10019<br>Tel: (212) 612-3270<br>Fax: (212) 612-3297<br>mark.berube@mishcon.com | 233 S. Wacker Drive, Suite 6100<br>Chicago, IL 60606<br>(312) 433-3200 (phone)<br>(312) 630-8500 (fax)<br>HLW@willmont.com<br><br>*Attorneys for Plaintiffs and the Prospective Class* |

---

[7] ████████████████████████████████████████████████████████████
████████████████████████

Legal1US.110768.1   15